FEE PAID

**FILED**

2018 MAY 21  PM 3:38

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY LAW

1   **William K. Hanagami, SBN 119832**
**THE HANAGAMI LAW FIRM**
2   **A PROFESSIONAL CORPORATION**
**5950 CANOGA AVENUE, SUITE 130**
3   **WOODLAND HILLS, CA 91367-5035**
**(818) 716-8570 / (818) 716-8569** *FAX*
4   **BillHanagami@esquire.la**

5   **Abram J. Zinberg, SBN 143399**
**THE ZINBERG LAW FIRM**
6   **A PROFESSIONAL CORPORATION**
**412 OLIVE AVENUE, SUITE 528**
7   **HUNTINGTON BEACH, CA 92648-5142**
**(714) 374-9802 / (714) 969-0910** *FAX*
8   **AbramZinberg@gmail.com**

9   Attorneys for Plaintiffs and *Qui Tam* Relators

10

UNITED STATES DISTRICT COURT
11
CENTRAL DISTRICT OF CALIFORNIA
12

13

14   UNITED STATES OF AMERICA, *ex rel.*    CASE NO.: SACV18-00885
[UNDER SEAL],                                      JVS (JEMx)
15
            Plaintiffs,
COMPLAINT FOR VIOLATIONS
16                                                      OF THE FEDERAL FALSE
vs.                                                  CLAIMS ACT, [UNDER SEAL]
17
[UNDER SEAL],
18
            Defendants.
19

20              [**UNDER SEAL** PER 31 U.S.C. § 3730(b)(2)]

21

22

23

24

25

26

27

28

1  **William K. Hanagami, SBN 119832**
   **THE HANAGAMI LAW FIRM**
2  **A PROFESSIONAL CORPORATION**
   **5950 CANOGA AVENUE, SUITE 130**
3  **WOODLAND HILLS, CA 91367-5035**
   **(818) 716-8570 / (818) 716-8569** *FAX*
4  **BillHanagami@esquire.la**

5  **Abram J. Zinberg, SBN 143399**
   **THE ZINBERG LAW FIRM**
6  **A PROFESSIONAL CORPORATION**
   **412 OLIVE AVENUE, SUITE 528**
7  **HUNTINGTON BEACH, CA 92648-5142**
   **(714) 374-9802 / (714) 969-0910** *FAX*
8  **AbramZinberg@gmail.com**

9  Attorneys for Plaintiffs and *Qui Tam* Relators,
   Paul Villamil and Kaitlyn Truman

10

                    UNITED STATES DISTRICT COURT
11
                   CENTRAL DISTRICT OF CALIFORNIA
12

13  UNITED STATES OF AMERICA, *ex rel.*     CASE NO.
14  PAUL VILLAMIL and KAITLYN
    TRUMAN,
15                                           COMPLAINT FOR VIOLATIONS
              Plaintiffs,                    OF THE FEDERAL FALSE
16                                           CLAIMS ACT, 18 U.S.C. § 2701,
    vs.                                      CALIFORNIA CONSTITUTION
17                                           ARTICLE I, CALIFORNIA
    MOBILE MEDICAL EXAMINATION               GOVERNMENT CODE § 12940;
18  SERVICES, INC., a California corporation; REQUEST FOR JURY TRIAL
    MEDXM, a business entity, form unknown;
19  WELLPOINT, INC., an Indiana corporation;
    ANTHEM BLUE CROSS, business entity,      **[UNDER SEAL** PER 31 U.S.C. §
20  form unknown; ANTHEM BLUE CROSS          3730(b)(2)]
    LIFE AND HEALTH INSURANCE
21  COMPANY, a California corporation; BLUE
    CROSS OF CALIFORNIA, a California
22  corporation; HEALTH NET, INC., a
    Delaware corporation; HEALTH NET OF
23  CALIFORNIA, INC., a California
    corporation;  HEALTH NET LIFE
24  INSURANCE COMPANY, a California
    corporation; MOLINA HEALTHCARE,
25  INC., a Delaware corporation; MOLINA
    HEALTHCARE OF CALIFORNIA, a
26  California corporation; MOLINA
    HEALTHCARE SERVICES, a California
27  corporation; MOLINA HEALTHCARE OF
    CALIFORNIA PARTNER PLAN, INC., a
28  California corporation;

                              -1-

                                                          COMPLAINT

UNITED HEALTHCARE INSURANCE COMPANY, a Connecticut corporation; UNITED HEALTHCARE SERVICES INC., a Minnesota Corporation; UHIC, a business entity, form unknown; UNITEDHEALTHCARE, a business entity, form unknown; UNITEDHEALTH, a business entity form unknown; AETNA, INC. a Pennsylvania Corporation; AETNA HEALTH HOLDINGS, LLC a Delaware Limited Liability Company; AETNA HEALTH OF CALIFORNIA, a California Corporation; AETNA HEALTH OF TEXAS, a Texas Corporation; AETNA HEALTH OF UTAH, a Utah Corporation; AETNA HEALTH OF FLORIDA, a Florida Corporation; AETNA BETTER HEALTH OF MICHIGAN, a Michigan Corporation; AETNA BETTER HEALTH OF NEW YORK, a New York Corporation; AETNA BETTER HEALTH OF OHIO, an Ohio Corporation.

Defendants.

COME NOW, Plaintiffs and *Qui Tam* Relators Paul Villamil and Kaitlyn Truman, individually and on behalf of the United States of America, and allege as follows:

<u>JURISDICTION AND VENUE</u>

1.      Plaintiffs and *Qui Tam* Relators Paul Villamil and Kaitlyn Truman (collectively, "Relators") file this action on behalf and in the name of the United States Government (Government) seeking damages and civil penalties against the defendants for violations of 31 U.S.C. § 3729(a).

2.      Relators also file this action on their own behalf seeking damages and other remedies against certain defendants for violations of 31 U.S.C. § 3730(h), 18 U.S.C. § 2701, and the California Constitution, Article I, Section 1. Relator Paul Villamil (Villamil) also files this action on his own behalf seeking damages and other remedies against certain defendants for violations of the California Fair Employment and Housing Act, *California Government Code* §§ 12900, et seq. (FEHA), pursuant to *California Government Code* § 12940(h) and (m).

3.      This Court's jurisdiction over the claims for violations of 31 U.S.C. §§ 3729(a) and 3730(h) is based upon 31 U.S.C. § 3732(a). Venue is vested in this Court under 31 U.S.C.

-2-

§ 3732(a) because at least one of the defendants transacts business in the Central District of California and many acts constituting violations of 31 U.S.C. § 3729(a) occurred in the Central District of California.  Venue is also vested in this Court under 28 U.S.C. § 1391(b) because at least one of the defendants transacts business in the Central District of California and many acts constituting violations of 31 U.S.C. § 3730(h) occurred in the Central District of California.

4.      This Court's jurisdiction over the claims for violations of 18 U.S.C. § 2701(a) is based upon 18 U.S.C. § 2707(a) and 28 U.S.C. §1331.  Venue is vested in this Court under 28 U.S.C. § 1391(b) because at least one of the defendants transacts business in the Central District of California and many acts constituting violations of 18 U.S.C. § 2701(a) occurred in the Central District of California.

5.      The Court's jurisdiction over the claims for violations of California Constitution, Article I, Section 1 and California Fair Employment and Housing Act, California *Government Code* §§12940, et seq. (FEHA), is based upon 28 U.S.C. § 1367(a).  On May 25, 2017, the California Department of Fair Employment and Housing issued a "right to sue" letter with regards to Villamil's FEHA claims.

## THE PARTIES

6.      Relators are citizens of the United States and residents of the State of California. Relators bring this action on behalf of the Government under 31 U.S.C. § 3730(b), and on their own behalf under 31 U.S.C. § 3730(h), 18 U.S.C. § 2701, the California Constitution, Article I, Section 1, and *California Government Code* § 12940.

7.      At all times relevant, the United States of America (Government) funded the Medicare program which provides payment of healthcare services for, among others, those 65 years of age or older.  The Government provided a Medicare option known as Medicare Advantage (MA), previously known as Medicare+Choice, in which eligible Medicare beneficiaries can enroll with a Medicare Advantage organization (MAO) contracted with the Government (for a capitated rate paid by the Government to the MAO) that would provide at least those services provided to standard (i.e., fee-for-service) Medicare beneficiaries.

-3-

8.      At all times relevant, defendant Mobile Medical Examination Services, Inc. is and was a corporation formed under the laws of the State of California, headquartered in Santa Ana, California and transacted business in, among other places, the Central District of California. At all times relevant, defendant MEDXM is a business entity, form unknown, and transacted business in, among other places, the Central District of California. All defendants referenced in this paragraph are collectively referred to in this Complaint as "MedXM."

9.      At all times relevant, MedXM contracted with various MAOs, including but not limited to the other defendants in this action, to perform physical medical examinations of such MAOs' MA patients at their residence and diabetic retinopathy eye examinations at temporary clinics for purposes of documenting and obtaining HCC risk adjustment scores.  In turn, MedXM retained physicians, nurse practitioners and/or physician assistants as independent contractors to perform such physical medical examinations, and optometrists to perform such diabetic retinopathy eye examinations.

10.     At all times relevant, defendant Wellpoint, Inc. is and was a corporation formed under the laws of the State of Indiana, and transacted business in, among other places, the Central District of California.  At all times relevant, defendant Anthem Blue Cross is and was a business entity, form unknown, and transacted business in, among other places, the Central District of California.  At all times relevant, defendants Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California are and were corporations formed under the laws of the State of California, and transacted business in, among other places, the Central District of California. All defendants referenced in this paragraph are collectively referred to in this Complaint as "Wellpoint."  Wellpoint owns or operates subsidary and/or affiliate MA plans that service MA patients nationwide.  For purposes of this Complaint, Wellpoint includes all of its subsidiaries and affiliates that do business with the Government and contracted with MedXM.

11.     At all times relevant, defendant Health Net, Inc. is and was a corporation formed under the laws of the State of Delaware, and transacted business in, among other places, the Central District of California.  At all times relevant, defendants Health Net of California, Inc.

-4-

and Health Net Life Insurance Company are and were corporations formed under the laws of the State of California, and transacted business in, among other places, the Central District of California. All defendants referenced in this paragraph are collectively referred to in this Complaint as "Health Net." Health Net owns and operates subsidiary and/or affiliate MA plans throughout the Western United States and also New York. For purposes of this Complaint, defendants Health Net include all of its subsidiaries and affiliates that do business with the Government and contracted with MedXM.

12. At all times relevant, defendant Aetna Inc. is a Pennsylvania corporation headquartered in Hartford, Connecticut. Aetna Inc.'s health insurance products include MA managed care plans and transacted business in, among other places, the Central District of California. At all times relevant Aetna Health Holdings LLC ("Aetna LLC") is a Delaware limited liability company and is wholly owned subsidiary of Aetna Inc. Aetna Health Holdings LLC owns and operates all of Aetna Inc.'s MA health plans throughout the United States including, but not limited to, MA plans that transacted business in, among other places, the Central District of California. At all times relevant, Aetna Health of California was and is a California corporation and transacted business, among other places the Central District of California. At all times relevant, Aetna Health of Texas was a Texas corporation. At all times relevant, Aetna Health of Utah was and is Utah corporation. At all times relevant, Aetna of Florida was a Florida Corporation. At all times relevant, Aetna Better Health of Michigan was a Michigan corporation. At all times relevant Aetna Better Health of New York was a New York corporation and at all times relevant Aetna Better health of Ohio was a n Ohio corporation. All defendants referenced in this paragraph are collectively referred to in this Complaint as ("Aetna"). For purposes of this Complaint, defendant Aetna includes all of its subsidiaries and affiliates that do business with the Government and contracted with MedXM.

13. At all times relevant, defendant Molina Healthcare, Inc. is and was a corporation formed under the laws of the State of Delaware, and transacted business in, among other places, the Central District of California. At all times relevant Molina Healthcare of California, Molina Healthcare Services, and Molina Healthcare of California Partner Plan,

-5-

Inc. are and were California corporations, and transacted business in, among other places, the Central District of California. All defendants referenced in this paragraph are collectively referred to in this Complaint as "Molina." Molina owns or operates MA plans in at least fifteen states. For purposes of this Complaint defendants Molina include all of its subsidiaries and affiliates that do business with the Government and contracted with MedXM.

14. At all times relevant, defendant United Healthcare Insurance Company is and was a corporation formed under the laws of the State of Connecticut, and transacted business in, among other places, the Central District of California. Defendant United Healthcare Services, Inc. is and was a corporation formed under the laws of the State of Minnesota, and transacted business in, among other places, the Central District of California. Defendants UHIC, UnitedHealth Group, UnitedHealthcare, UnitedHealth, are business entities, form unknown, that transacted business in, among other places, the Central District of California. All defendants referenced in this paragraph are collectively referred in this Complaint as "United Healthcare" and are or were MAOs. United Healthcare operates MA plans in all fifty states and the District of Columbia covering approximately 2.2 million enrolled MA beneficiaries. For purposes of this Complaint, defendants United Healthcare include all of its subsidiaries and affiliates that do business with the Government and contracted with MedXM.

15. At all times relevant, United Healthcare, Wellpoint, Aetna, Health Net, and Molina, are and were managed care organizations that contracted with the Government as MAOs. The defendants referenced in this paragraph are collectively referred in this Complaint as "defendant Health Plans."

16. Relator Villamil is a resident of Orange County, California. Villamil was employed with MedXM from October 2015 until the end of May 2016 and worked in MedXM's Data Processing (DP) Department where his main job function was to notify Primary Care Physicians (PCPs) that MedXM had performed a Health Assessment or other type of exam of a MA enrollee assigned to that PCP and to arrange for the transmission of a copy of the assessment or other exam report, such as a diabetic retinopathy exam or bone mineral density scan, to the enrollee's PCP.

17.     Realtor Kaitlyn Truman (Truman) is a resident of Orange County, California. Truman was employed with MedXM between May 2015 and June 23, 2016 as the DP Department's assistant supervisor.   While working in the DP department, Truman was responsible for assisting in the training of DP staff to contact PCP offices to notify them that MedXM had performed Health Assessments and/or diabetic retinopathy eye exams on MA enrollees assigned to that PCP and to arrange for sending copies of such exams to the enrollee's PCP.

**Medicare Overview**

18.     Medicare is a federally-operated health insurance program administered by the Government's Centers for Medicare and Medicaid Services (CMS).   Medicare benefits individuals age 65 and older and the disabled. 42 U.S.C. § 1395c et seq. Parts A and B of the Medicare Program are known as "traditional" Medicare. Medicare Part A covers inpatient and institutional care. Medicare Part B covers physician, hospital outpatient, and ancillary services and durable medical equipment.

19.     Under Medicare Parts A and B, CMS reimburses healthcare providers (e.g., hospitals and physicians) using what is known as a "fee-for-service" ("FFS") payment system. Under a FFS payment system, healthcare providers submit claims to CMS for reimbursement for each service, such as a physician office visit or a hospital stay.   CMS then pays the providers directly for each service.

20.     Medicare beneficiaries who enroll in an MA Plan are considered a member of and enrollee in that plan.  In this Complaint, the terms beneficiaries, members, enrollees, and patients are used interchangeably, but mean the same thing, i.e. individuals enrolled in MA plans.

21.     The MA program is Medicare's managed care program which is administered by CMS.  The MA program, also known as Medicare Part C, requires the MA plan to provide all of the benefits provided under traditional Medicare, also known as FFS Medicare, and all additional supplemental benefits, if any, that have been approved by CMS and made part of that MA plan.  42 C.F.R. § 422.100(a). Through the MA program, Medicare allows private

1  health insurers to set up managed care plans to cover their MA beneficiaries.

2  22.    Under the MA program, the Government, through CMS, pays an MAO a per-

3  member-per-month (pmpm) capitation payment in exchange for the MAO providing or

4  arranging for the provision of all covered health care services required by the MA beneficiaries

5  that select such MAO as their MA plan.    CMS adjusts the capitation payment for each

6  beneficiary to reflect that beneficiary's individual demographics (*e.g.*, age, gender and

7  geographic location) and health status.

8  **Medicare Coverage Requirements**

9  23.    The MA program complies with the same coverage determinations as traditional

10  Medicare.    42 C.F.R. § 422.101(b)(1)-(3); Medicare Managed Care Manual (MMCM), Ch.

11  4 §§10.2, 30.2.    Services must be medically reasonable and necessary to be covered by

12  Medicare,  42 C.F.R. § 411.15(k)(1), and must be covered as a requirement for Medicare to

13  pay.    42 C.F.R. § 424.5.    Routine physical examinations, such as MedXM's Health

14  Assessments, are excluded from an MA Plan's coverage unless covered by the MA Plan as a

15  supplemental benefit previously approved by CMS. 42 C.F.R. §§ 411.15(a)(1), 422.101(b)(1)-

16  (3); MMCM, Ch. 4 §§ 10.2, 30.2. The regular submission of claims for medically unnecessary

17  services (i.e., non-covered) constitutes a fraud upon the Government.    42 U.S.C. § 1320a-

18  7a(a)(1)(E).  *See also*, Medicare Program Integrity Manual, Ch. 4 § 4.2.1.

19  24.    Medicare requires that all diagnostic tests must be ordered by the patient's

20  treating physician. 42 C.F.R. § 410.32(a). Tests not ordered by the patient's treating physician

21  are not reasonable nor necessary, and therefore are excluded from coverage under Medicare.

22  42 C.F.R. §§ 410.32(a), 411.15(k)(1).

23  25.    Under traditional Medicare, providing medical services at a patient's home is

24  only covered by Medicare if the patient's treating physician has documented, in the patient's

25  medical record, the medical necessity of such an in-home visit.   42 C.F.R. §§ 409.42(a),

26  424.22(a), 411.15(k)(1); Medicare Benefit Policy Manual, Ch. 7, §§ 20.1, 30.1; Medicare

27  Claims Processing Manual, Ch. 12 § 30.6.14.1 ["Under the home health benefit the beneficiary

28  must be confined to the home for services to be covered.  For in-home services provided by

a physician using these codes, the beneficiary does not need to be confined to the home. **The medical record must document the medical necessity of the home visit made in lieu of an office or outpatient visit.**" (Emphasis added.)][1]

26. CMS instructed all MAOs, including the defendant Health Plans, that in-home assessments must comply with Medicare's coverage criteria. See, <u>CMS Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter</u>, (April 16, 2015) p. 145 ("2016 Final Call Letter"), ["The coverage criteria for home health visits and physician in-home visits are established under original Medicare. (MA plans may have less restrictive coverage terms for covering home health and/or in-home visits as a supplemental benefit.) Medicare coverage for home health visits require, among other things, that the enrollee be homebound and require skilled nursing and/or rehabilitation services in the home. Physician or non-physician practitioners may furnish the visits, depending on the treatment program set out in the plan of care. Original Medicare also covers in-home visits by a physician or non-physician practitioner when care is medically reasonable and necessary."]

27. Further, CMS warned that in-home Health Assessments that are used primarily as a tactic to obtain risk adjustment data violates Medicare Fraud Waste and Abuse laws stating, "Our concerns related to the in-home enrollees risk assessments were two-fold. First, we were concerned that in-home assessments were merely a strategy by MA plans to find and report more diagnosis codes to CMS, generating higher levels of coding and, therefore, payment than assumed under our risk adjustment methodologies. Second, we were concerned that, while there is potential for the home assessments to improve care, we want to be sure that providers who regularly care for these enrollees actually receive and use the information collected in these assessments and that the care subsequently provided to enrollees is substantially changed or improved as a result of the assessments." <u>2016 Final Call Letter</u>, p. 145.

---

[1] The term "home health services" is a defined term under the Social Security Act. 42 U.S.C § 1395x(m). Patients receiving home health services must be certified by their treating physician as being home bound.

28.     Medicare has always considered the submission of risk adjustment data and encounter data from MA plans as the submission of claims, and that MAOs' 42 C.F.R. § 422.504(*l*) certifications are essential to ensure the data accuracy.  *See*, 63 Fed.Reg. 34968, 35017 (June 26, 1998).[2]

29.     MA Plans can establish coverage for an otherwise excluded item or service, such as routine physical exams (excluded per 42 C.F.R. § 411.15(a)(1)), by having the item or medical service previously approved by CMS as a supplemental benefit to that particular MA Plan. 42 C.F.R. §§ 422.102, 422.254(a)-(b); MMCM Ch. 4 §§ 10.2, 30.2.  CMS requires that supplemental benefits be submitted for approval by June of the prior year and if approved, such supplemental benefits must be available on the same terms and conditions to all enrollees of the MAO's MA Plan. 42 C.F.R. §§ 422.254(a), 422.102(a)(2); MMCM, Ch. 4 §§10.2, 30.2.

**Medicare Advantage Risk Adjustment Data**

30.     At all times relevant, Section 1853(a)(3) of the Social Security Act [42 U.S.C. § 1395w-23(a)(3)], as implemented by 42 C.F.R. § 422.308(c), required CMS to risk adjust payments to MAOs, such as the defendant Health Plans.  In general, the risk adjustment methodology relies on enrollee diagnoses, as specified by the International Classification of Disease, Ninth Revision Clinical Modification Guidelines for Coding and Reporting (ICD-9), to prospectively adjust capitation payments for a given enrollee based on the health status of the enrollee. Beginning October 1, 2015, the ICD-9 Guidelines and codes were replaced and updated by the International Classification of Diseases, Clinical Modification Guidelines for Coding and Reporting Tenth Revision (ICD-10).  References to ICD-10 shall include ICD-9 as applicable unless otherwise stated.  Medical diagnosis codes (ICD-10 codes) and related information (collectively, "risk adjustment data") submitted by MAOs, such as the defendant

---

[2]"In all of these cases, when an M+C organization submits the data in question to HCFA, we believe that it is making a 'claim' for capitation payment in the amount dictated by the data submitted. . . . We believe it is important that when an M+C organization is claiming payment (or the right to retain payment) in a particular amount based upon information it is submitting to HCFA, it should be willing to certify the accuracy of this information. We believe that these certifications will help ensure accurate data submissions, and assist HCFA and the Office of Inspector General in anti-fraud activities."  63 Fed.Reg. 34968, 35017 (June 28, 1998). [HCFA is the acronym for Health Care Financing Administration, the predecessor to CMS.]

Health Plans, to CMS were used to develop Hierarchical Condition Category (HCC)[3] risk adjustment scores that are used by CMS to adjust the capitated payment rates paid by the Government to that particular MAO. The HCC risk adjustment scores compensated a MAO with a population of patients with more severe illnesses than normal through higher capitation rates. Likewise, a MAO with a population of patients with less severe illnesses than normal would see a downward adjustment of its capitation rates because it was servicing a healthier than normal population of patients. By risk adjusting MAO payments, CMS attempts to make appropriate and accurate payments for enrollees with differences in expected healthcare costs. Risk adjustment data records the health status and demographic characteristics of an enrollee. This process was phased in beginning in or about 2005 and was completed by or about the end of the 2008 risk adjustment data submissions.

31.     In order to obtain an HCC risk adjustment score for a MA enrollee for a given year, the enrollee must have a face-to-face encounter with a medical provider or examiner that generates a diagnosis code or codes, which were timely submitted to CMS. If a MA enrollee does not have a reported encounter with a medical provider or examiner that generates a diagnosis code during the year, the following year CMS will pay the MAO a lower capitated rate for that MA enrollee as though s/he was perfectly healthy, even though in prior years the MA enrollee had a diagnosis or diagnoses that resulted in significant HCC risk adjustment scores and correspondingly higher capitation rates.

**Risk Adjustment Data - Basic Requirements**

32.     Risk adjustment data (RAD) submitted by or on behalf of a MAO to CMS must be supported by properly documented medical records.[4] In order to be a properly documented

---

[3]Not all diagnoses result in a HCC risk adjustment score. Only certain diagnosis codes or combinations thereof result in HCC risk adjustment scores. A HCC risk adjustment score will vary upon the diagnosis codes or combinations thereof according to a matrix determined by the Government.

[4]42 C.F.R. §§ 422.310(c)(2) and (d), 422.504(l); Medicare Managed Care Manual, Ch. 7, § 40 [Medicare Advantage Organizations "must . . . [e]nsure the accuracy and integrity of risk adjustment data submitted to CMS. All diagnosis codes must be documented in the medical record and must be documented as a result fo a face-to-face visit. . . ."]; *see also,* 79 Fed.Reg. No. 100, 29844, 29923 (May 23, 2014) ["Further, CMS has required for many years that diagnoses that MA organizations

medical record, the medical record entries must, among other things, (1) be the result of a MA enrollee's face-to-face encounter with a medical provider or examiner legally authorized to perform the service rendered under applicable Medicare laws, regulations and rules,[5] and (2) accurately and truthfully document the findings necessary to support the medical diagnoses by the medical provider/examiner in accordance with applicable Medicare laws, regulations and rules.[6] MA coding must be done the same way that fee-for-service Medicare coding is done. *See*, <u>CMS, Calendar Year (CY) 2009 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies,</u> (April 7, 2008) p. 20 ["Given the fact that the MA payment methodology is based on fee-for-service payments, and that the risk adjustment methodology is designed to compare the risk scores of MA plan enrollees to other plan enrollees and beneficiaries not enrolled in MA plans, for this comparison to be valid, MA plans must code the way Medicare Part A and B does."]

33.     In order to submit risk adjustment data to CMS, all MAOs, such as the defendant Health Plans, must enter into an electronic data interchange (EDI) agreement with CMS's contractor and each MAO must promise, among other things, (a) it will be responsible for all RAD coding submitted to CMS regardless of source, (b) that to its best knowledge and belief, will submit only accurate, truthful and complete diagnosis codes, and (c) that it will research and correct RAD discrepancies. CMS 2007 Risk Adjustment Data Basic Training For Medicare Advantage Organizations, Resource Guide, ("2007 RAD Resource Guide") pp. 31-32, available at https://www.csscoperations.com/internet /Cssc.nsf/files/ra-resourceguide_120607.32.pdf/$File/ra-resourceguide_120607.pdf.   "MAOs must submit data that conform

---

submit for payment be supported by medical record documentation."]

[5]*See,* Medicare Managed Care Manual, Ch. 7, § 40 ["All diagnosis codes submitted must be documented in the medical record and must be documented as a result of a face-to-face visit. . . . "]; 42 U.S.C. § 1395x(r) , (aa)(5)(A), (aa)(6); 42 C.F.R. §§ 410.20(b), 410.74(a)(2), 410.75(b)-(c), made applicable to Medicare Advantage by 42 C.F.R. §§ 422.101(b)(2) and 422.310(d).

[6]42 C.F.R. §§ 422.310(c)(2) and (d), 422.504(l)(2)-(3); CMS Pub.100-08, Medicare Program Integrity Manual, Ch. 3, §3.3.2.5;  International Classification of Disease 9th Revision Guidelines (ICD-9 and ICD-10), made applicable to Medicare Advantage by 42 C.F.R. §§ 422.101(b)(2) and 422.310(d), and Medicare Managed Care Manual, Ch. 7, § 40 ["The diagnosis must be coded according to International Classification of Diseases, (ICD) Clinical Modification Guidelines for Coding and Reporting."]

-12-

to CMS' requirements for data equivalent to Medicare fee-for-service data, when appropriate, and to all relevant national standards. . . ." 42 C.F.R. §§ 422.310(d), 422.101(b)(1)-(2). This requires, among other things, that MA diagnoses be coded in accordance with all applicable national guidelines, including but not limited to ICD-10 Guidelines and the American Health Information Management Association (AHIMA) national guidelines for ethical coding.[7] Failure to meet any of these required elements results in the medical record not being properly documented and being unable to support RAD arising therefrom, and the RAD being invalid. MAOs must reconcile CMS Risk Adjustment Reports in a timely manner and must track their submission and deletion of diagnosis codes on an ongoing basis. If a MAO determines that any diagnosis codes that have been submitted do not meet the risk adjustment submission requirements, the MAO is responsible for deleting the submitted diagnosis as soon as possible.[8]

34.     Last, it is well established that CMS considers intentionally attempting to obtain payment for services that are not covered, nor chargeable, as fraud. Medicare's Program Integrity Manual lists several examples of frauds that providers are expected to avoid. This list specifically includes, "Billing non-covered or non-chargeable services as covered items." Medicare Program Integrity Manual, Ch. 4 § 4.2.1.

*///*

---

[7] 42 C.F.R. § 422.310(d)(1) ["MA organizations must submit data that conform to CMS' requirements for data equivalent to Medicare fee-for-service data, when appropriate, and to all relevant national standards. . . ."]; Medicare Managed Care Manual, Ch. 7, § 40 ["The diagnosis must be coded according to International Classification of Diseases (ICD) Clinical Modification Guidelines for Coding and Reporting."]; AHIMA 2009, Amendments, Corrections ans Deletions in the electronic Health Record: Toolkit, pp. 1-8, http://library.ahima.org/xpedio/groups/public/documents/ahima /bok1_044678.hcsp?dDocName=bok1_044678; Medicare Program Integrity Manual, Ch. 3, §3.3.2.5(A)-(B).

[8] 42 C.F.R. § 422.326; *see,* Medicare Managed Care Manual, Ch. 7, § 40 [ "If ... any diagnosis codes that have been submitted do not meet risk adjustment submission requirements, the plan sponsor is responsible for deleting the submitted diagnosis codes as soon as possible." Medicare Advantage Organizations, "must [r]eceive and reconcile CMS Risk Adjustment Reports in a timely manner. Plan sponsors must track their submission and deletion of diagnosis codes on an ongoing basis."]; *see also,* 79 Fed.Reg. No. 100, 29844, 29923 (May 23, 2014) ["MA organizations and Part D sponsors are responsible for ensuring that payment data they submit to CMS are accurate, truthful, and complete . . . and are expected to have effective and appropriate payment evaluation procedures and effective compliance programs as a way to avoid receiving or retaining overpayments."]

**Risk Adjustment Data Can Only Come From Covered Services**

35.     RAD, including diagnosis codes, is used in the development and application of CMS's risk adjustment payment model. 42 C.F.R. § 422.310(a).  MAOs, such as the defendant Health Plans, must collect and submit to CMS such risk adjustment data from their contracted healthcare providers in connection with covered services rendered to such MAOs' MA beneficiaries. 42 C.F.R. § 422.310(b)-(c).  Such covered services are those services covered under original fee-for-service Medicare and "[o]ther additional or supplemental benefits that MA organization may provide." 42 C.F.R. § 422.310(c); *see also,* MMCM, Ch. 7 § 120.1, Table 14 showing partial list of non-covered ambulatory services; *see also,* 2007 RAD Resource Guide, p. 15, ["CMS has provided a list of ambulatory services that are "non-covered services" and, therefore, are unacceptable for risk adjustment."]  Supplemental benefits are covered under the MAO's MA plan only if they are approved by CMS in accordance with such MAO's bid submission to ensure, among other things, that the benefits conform to Medicare's fee-for-service guidelines and the MAO has enough funds to cover the costs. 42 C.F.R. §§ 422.101(a), (b), 422.102(a)-(c), 422.254(a).

36.     Because MAOs, such as the defendant Health Plans, cannot legally provide non-covered or excluded services to its MA enrollees, RAD is restricted to data obtained from the provision of lawfully provided items and services covered under that MA Plan's benefits (i.e., traditional FFS Medicare benefits and CMS-approved supplemental benefits, if any.)[9] 42 U.S.C. § 1320a-7a(a)(1)(E); 42 C.F.R. §§ 411.15(a)(1), (k)(1), 424.5(a), 422.310(c), (d), 422.254(a), (b), 402.3; MMCM, Ch. 7 § 120.1, 120.1.1. Medicare Program Integrity Manual, Ch. 4 § 4.2.1.

**Anti-Kickback Statute - Overview**

37.     Medicare's anti-fraud provision, commonly referred to as the Anti-Kickback Statute (AKS) is found at 42 U.S.C. § 1320a-7b(b), which makes it a felony to offer, pay,

---

[9]Routinely submitting claims for services that are not medically and necessary constitute a fraud pursuant to 42 U.S.C. § 1320a-7a(a)(1)(E), see also 42 C.F.R. § 402.3. "Billing non-covered or non-chargeable services as covered items" constitutes Medicare fraud. Medicare Program Integrity Manual, Ch. 4 § 4.2.1.

-14-

1  solicit or receive anything of value to induce a referral to or the utilization of any item or

2  service that is paid in whole or in part under a Federal health care program.  *See*, 42 U.S.C.

3  § 1320a-7b(b).  Claims submitted to CMS tainted by violations of the AKS are deemed false

4  claims under the False Claims Act, 31 U.S.C. §§ 3729, et seq. (FCA), and like other FCA

5  violations, no specific intent to defraud is required to violate the AKS.  *See*, 42 U.S.C. §

6  1320a-7b(g)-(h).

7         38.    The application of the AKS is very broad and is intended to reach all types of

8  frauds to prevent Medicare and Medicaid fraud and was enacted to "protect the Medicare and

9  Medicaid programs from increased costs and abusive practices resulting from provider

10  decisions that are based on self-interest rather than cost, quality of care or necessity of

11  services."  *United States v. Patel,* 778 F.3d 607, 612 (7th Cir. 2015), quoting Health Res. &

12  Serv. Admin., Program Assistance Letter 1995–10, *Guidance on the Federal Anti–Kickback*

13  *Law,* available at http://bphc.hrsa. gov/policiesregulations/policies/pal199510.html.

14         39.    The subject in-home Health Assessments qualify as illegal remuneration under

15  the AKS because one reason they were offered was to induce the MA enrollees to consent to

16  ordering the in-home Health Assessment itself.  The subject in-home Health Assessments also

17  qualify as the prohibited referral, paid for under a Federal health care program because they

18  were paid for by MA plans for services provided to MA enrollees in connection with gathering

19  MA program RAD data.  See, *United States v. Ruttenberg,* 625 F.2d 173, 177 (7th Cir. 1980)

20  ["[N]othing in the statute requires that a kickback be made of funds to which the payor would

21  not be entitled. Payment of a kickback to those in control of federal funds is all that is required,

22  and such payment meets the *Zacher* definition of corrupt payment as one 'in violation of the

23  duty imposed by Congress on providers of services to use federal funds only for intended

24  purposes and only in the approved manner.'"]

25  **Health Assessment Frauds - Non-Covered Services**

26         40.    Beginning during or about 2012 and continuing to the present, defendants

27  Wellpoint, Health Net ,Aetna and Molina each entered into separate agreements with MedXM

28  for MedXM to perform in-home Health Assessments of such defendant Health Plans' MA

-15-

enrollees, even though in-home services are not covered under such MA Plans. MedXM employed schedulers telephonically contacted MA enrollees to arrange for MedXM's contracted medical examiners to perform Health Assessments at the MA enrollees' residence. MedXM's coding department coded the medical diagnoses identified in the resulting Health Assessment reports with the corresponding ICD-10 diagnosis codes. MedXM then transmitted complete copies of the Health Assessment reports and related ICD-10 diagnosis codes to said defendants Wellpoint, Health Net ,Aetna and Molina who in turn submitted the RAD and encounter data submissions obtained from the Health Assessments to CMS as RAD for use in calculating MA capitation payment rates.

41. MedXM's schedulers offered MA enrollees a choice of Amazon or Target gift cards, valued between $25 and$50, as an inducement to those MA enrollees who were initially reluctant to schedule an in-home Health Assessment examination. MedXM offered such gift cards to MA enrollees on behalf of defendants Wellpoint, Health Net ,Aetna and Molina. Although CMS allows MAOs to provide modestly priced gift cards as part of a valid Reward and Incentive (R&I) Program pursuant to 42 C.F.R. § 422.134, the gift cards offered by MedXM were not part of a valid R&I Program because the gift cards were only offered to reluctant MA enrollees, and not offered to all MA members on an equal basis.[10] 42 C.F.R. § 422.134(b)(2). Accordingly, MedXM's selective offer and/or provision of gift cards to MA enrollees constitutes violations of the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b)(2)(B). *See,* 42 C.F.R. § 422.134(c)(1)(iv).

42. The in-home Health Assessments performed by MedXM, on behalf of defendants Wellpoint, Health Net ,Aetna and Molina are medically unnecessary and excluded routine physicals under traditional FFS Medicare's coverage pursuant to 42 C.F.R. § 411.15(a)(1). While defendants Wellpoint, Health Net, Aetna and Molina could have each

---

[10]Non-covered items or services that are provided as part of a valid reward and incentive (R&I) program must still be accounted for as a non-benefit expense in the annual bid. 42 C.F.R § 422.134; MMCM, Ch. 4 §100, ["An R&I Program is not a benefit. It must be included in the bid as a non-benefit expense but must not be entered in the Plan Benefit Package. Per CMS Office of the Actuary Bidding Guidance, "non-benefit expenses are all of the bid-level administrative and other non-medical costs incurred in the operation of the MA plan."]

elected to have CMS include routine physicals as an approved supplemental benefit, available to all of their MA enrollees, none of them elected to do so. 42 C.F.R. §§ 422.254, 422.256(a) and (b). Medicare only reimburses MAOs, such as defendants Wellpoint, Health Net, Aetna and Molina, for services that are covered services under original FFS Medicare or provided as an approved supplemental benefit under a MA plan. 42 C.F.R. §§ 424.5, 411.15(k)(1), 422.256; Medicare Managed Care Manual, Ch. 4 §§10.2, 10.3, 30.2. MAOs such as defendants Wellpoint, Health Net, Aetna and Molina must disclose all of the benefits they are going to provide, including any supplemental benefits not covered under original FFS Medicare, by June of the prior year, in order to obtain CMS's approval to provide such benefits as part of their plan's benefits. 42 C.F.R. §§ 422.254(a) and (b), 422.256(a) and (b). Defendants Wellpoint, Health Net, Aetna and Molina each failed to include the in-home assessments they had MedXM provide to selected MA enrollees, as an approved supplemental benefit in their annual summary of benefits. Further, it is fraudulent to submit non-covered, excluded or medically unnecessary services to CMS for reimbursement purposes. 42 U.S.C. § 1395y(a)(1)(A); Medicare Program Integrity Manual, Ch 4. §4.2.1. Therefore, defendants Wellpoint, Health Net, Aetna and Molina cannot lawfully submit RAD, for use in calculating capitation rates, to CMS obtained from the Health Assessments performed by MedXM because such assessments are non-covered and excluded services.[11]

**Health Assessment Frauds - Kickback Violations**

43.     The AKS makes it illegal for MedXM and defendants Wellpoint, Health Net, Aetna or Molina to knowingly and willfully offer or pay "any remuneration . . . in cash or in kind to any person to induce such person . . . to . . . order, or arrange for . . . any . . . service . . . for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B).

44.     MedXM's offer and provision of free, medically unnecessary, non-covered and

---

[11]CMS prescribes methods for submitting claims and encounter data form non-covered services by using modifiers that inform CMS that such claims and encounters are not to be processed for payment purposes. *See*, Medicare Claims Processing Manual, Ch. 1 §60 et seq. See also CMS, 2012 Regional Technical Assistance Encounter Data Participant Guide, § 2-3 explaining that only accepted not denied claims can be submitted to the EDS for payment calculation purposes.

-17-

excluded medical services (i.e., the Health Assessments) to select MA enrollees of defendants Wellpoint, Health Net, Aetna and Molina for utilizing the Health Assessments conducted by MedXM's medical examiners violates 42 U.S.C. § 1320a-7b(b)(2)(B) because the Health Assessments were illegal remuneration intended to induce and/or did induce said defendants' MA enrollees to utilize MedXM's Health Assessments, which are paid for in whole or in part under such defendants' MA contracts with CMS.

45.    Likewise, MedXM's offer and provision of $25-$50 gift cards to MA enrollees of defendants Wellpoint, Health Net, Aetna and Molina that were reluctant to schedule a Health Assessment conducted by MedXM's medical examiners violates 42 U.S.C. § 1320a-7b(b)(2)(B) because the gift cards were illegal remuneration intended to induce and/or did induce the MA enrollees of said defendants to utilize MedXM's Health Assessments, which were paid for, in whole or in part, under said defendants' MA contracts with CMS and are not part of a valid R&I program.

**Overpayments**

46.    By violating 42 U.S.C. § 1320a-7b(b)(2)(B) and submitting the resulting ICD-10 diagnosis codes obtained from MedXM's in-home Health Assessments to CMS, 42 U.S.C. § 1320a-7b(g) provides that said defendant Health Plans' submission of such ICD-10 diagnosis codes and any related express or implied certifications to CMS constitute "false and fraudulent claim[s] for payment or approval" for purposes of 31 U.S.C. §3729(a)(1)(A), and/or "false record[s] or statement[s] material to a false or fraudulent claim" for purposes of 31 U.S.C. §3729(a)(1)(B). Likewise, MedXM violated 42 U.S.C. § 1320a-7b(b)(2)(B) by offering and/or providing the improper remuneration to the MA enrollees of defendants Wellpoint, Health Net, Aetna and Molina and therein violated the FCA. 42 U.S.C. § 1320a-7b(g). Additionally, MedXM violated 31 U.S.C. § 3729(a)(1)(A) and (B) by submitting or causing to be submitted false claims for payments and by submitting or causing to be submitted false records and statements material to false and fraudulent claims. Accordingly, CMS overpaid defendants Wellpoint, Health Net, Aetna and Molina to the extent CMS paid inflated capitation payments to these defendants that were based upon ICD-10 diagnosis codes obtained from the MedXM

-18-

1  Health Assessments provided to any MA enrollees of defendants Wellpoint, Health Net, Aetna

2  and Molina .

3      47.     42 C.F.R. § 422.326 makes it a violation of 31 U.S.C. § 3729(a)(1)(G) for

4  MAOs to retain an overpayment for more than 60 days. Defendants  Wellpoint, Health Net,

5  Aetna and Molina each violated 42 C.F.R. § 422.326 by retaining inflated capitation payments

6  from that resulted from the in-home assessments performed by MedXM. At all times relevant,

7  defendants  Wellpoint, Health Net, Aetna and Molina knew that MedXM utilized the subject

8  illegal kickback scheme to induce its MA enrollees to partake in the Health Assessments

9  offered by MedXM.  At all times relevant, defendants  Wellpoint, Health Net, Aetna and

10  Molina obtained and improperly submitted the resulting diagnosis codes to CMS as valid RAD

11  which caused CMS to pay inflated capitated overpayments to said defendant Health Plans.

12      48.     At all times relevant, defendants  Wellpoint, Health Net, Aetna and Molina knew

13  MedXM provided their MA enrollees Health Assessments that were excluded routine

14  physicals, were not reasonable and necessary for failing to comply with Medicare's coverage

15  criteria for providing in-home medical services and were not covered as a supplemental

16  benefit.  At all times relevant, defendants Wellpoint, Health Net, Aetna and Molina obtained

17  and improperly submitted the resulting diagnosis codes to CMS as valid RAD for use in

18  calculating their capitation rates, which caused CMS to pay inflated capitated overpayments

19  to defendants  Wellpoint, Health Net, Aetna and Molina.

20  **Frauds From Providing Diabetic Retinopathy Eye Exams**

21      49.     Beginning in 2015 and continuing to the present, defendants United Healthcare

22  and Molina each contracted with MedXM to provide diabetic retinopathy eye exams to their

23  MA enrollees.  The purpose of these diabetic retinopathy eye exams was to obtain ICD-10

24  diagnosis codes to submit to CMS as RAD. MedXM employed schedulers who contacted MA

25  enrollees, on behalf of defendants United Healthcare and Molina, to arrange for MedXM

26  contracted optometrists to perform diabetic retinopathy eye exams.  The examinations were

27  performed at temporary locations set up within neighborhood Walmart stores throughout the

28  United States. MedXM's schedulers offered a choice of Amazon or Target gift cards valued

-19-

1    between $25 and $50 as an inducement to those MA enrollees who were initially unwilling or

2    reluctant to schedule a diabetic retinopathy eye exam.

3        50.    MedXM had its data processing department staff, instead of its coding

4    department which was staffed with certified medical coders, code the ICD-10 diagnosis codes

5    identified in the diabetic retinopathy eye exam reports.  MedXM did not provide any training

6    to the data processing staff regarding how to properly code the diabetic retinopathy eye exams.

7    Instead, MedXM provided a list of ICD-10 diagnosis codes that represented various positive

8    results to the diabetic retinopathy eye exams and instructed the data processing staff to select

9    the ICD-10 diagnosis codes that best matched the optometrist notes and findings for a

10    particular eye exam.   The coding performed by MedXM's data processing department was

11    routinely false and fraudulent.  MedXM made no effort to review, audit or correct the coding

12    of the diabatic retinopathy eye exams that were coded by MedXM's data processing

13    department.

14        51.    Although the diabetic retinopathy eye exam is used to detect early damage to the

15    eyes caused by diabetes, it is not an approved general diabetic screening exam.  See, 42 C.F.R.

16    § 410.18. The American Diabetes Association recommends that MA enrollees who have been

17    diagnosed with Type 1 diabetes have this exam within the five years of the initial diabetes

18    diagnosis.  MA enrollees with Type 2 diabetes should have the first diabetic retinopathy eye

19    exam immediately after the initial Type 2 diagnosis.  If the results are negative, follow up

20    exams for both types of diabetes are once every two years. (Diabetic Retinopathy: A Position

21    Statement by the American Diabetes Association, Diabetes Care 2017 Mar; 40(3): 412-418.

22    https://doi.org/10.2337/dc16-2641).

23        52.    Like all other diagnostic tests, Medicare requires that the enrollee's treating

24    physician orders the diabetic retinopathy examination.  42 C.F.R. § 410.32(a).  MedXM and

25    defendants Molina and United Healthcare were aware that Medicare requires the MA

26    enrollee's treating physician must order the such diagnostic test, but instead of complying with

27    this requirement allowed MedXM to fraudulently have its contracted physicians to order the

28    diabetic retinopathy eye exams. Ali Zahedi, M.D., the father of MedXM's CEO, Sy Zahedi

-20-

was one of the physicians who routinely signed fraudulent orders for the diabetic retinopathy eye exams despite the fact that Dr. Zahedi had no contact with any of the MA enrollees. Relators are informed and believe and thereupon allege that, in addition to Dr. Zahedi, MedXM paid for four or five other doctors to fraudulently order diabetic retinopathy eye exams. It was not uncommon for Dr. Zahedi to execute these fraudulent orders for MA enrollees who resided outside of California, in violation of his California Medical License, or for patients who had not been previously diagnosed with diabetes in violation of the requirements for diabetic screening exams. 42 C.F.R. § 410.18(b).

53.     MedXM's failure to obtain the MA enrollees' treating physicians' order for diabetic retinopathy eye exams results in such tests not being medically reasonable or necessary, and therefore excluded from Medicare's coverage. 42 C.F.R. §§ 410.32(a), 411.15(k)(1). The submission of the resulting ICD-10 diagnosis codes to CMS as valid RAD by Molina and United Healthcare of these medically unnecessary and excluded test results are false and fraudulent claims, and false records and/or false statements material to false claims in violation of 31 U.S.C. § 3729(a)(1)(A) and (B).

54.     MedXM's offer and provision of free, medically unnecessary, and excluded diabetic retinopathy eye exams to select MA enrollees of United Healthcare and Molina for utilizing MedXM's diabetic retinopathy eye exams violates 42 U.S.C. § 1320a-7b(b)(2)(B) because the diabetic retinopathy eye exams were illegal kickback remuneration that were intended to induce and/or did induce United Healthcare's and Molina's MA enrollees to utilize MedXM's diabetic retinopathy eye exams which were paid for in whole or in part under the United Healthcare's and Molina's Medicare Advantage contracts with CMS.

55.     Likewise, MedXM's offer and provision of $25-$50 gift cards to United Healthcare's and Molina's MA enrollees who were reluctant to schedule diabetic retinopathy eye exams with MedXM's medical examiners violates 42 U.S.C. § 1320a-7b(b)(2)(B) because the gift cards are illegal kickback remuneration that were intended to induce and/or did induce the MA enrollees of defendants United Healthcare and Molina to obtain diabetic retinopathy eye exams from MedXM, which were paid for in whole or in part using funds paid under said

-21-

1    defendants' MA contracts with CMS and are not part of a valid R&I program, for the reasons

2    previously set forth in paragraph 41.

3         56.    By violating 42 U.S.C. § 1320a-7b(b)(2)(B) and submitting to CMS the resulting

4    ICD-10 diagnosis codes obtained from MedXM's diabetic retinopathy eye exams, 42 U.S.C.

5    § 1320a-7b(g) provides that United Healthcare's and Molina's submission of such ICD-10

6    diagnosis codes to CMS and any related express or implied certifications made to CMS

7    constitute "false and fraudulent claim[s] for payment or approval" for purposes of 31 U.S.C.

8    §3729(a)(1)(A), and/or "false record[s] or statement[s] material to a false or fraudulent claim"

9    for purposes of 31 U.S.C. § 3729(a)(1)(B).  Accordingly, CMS overpaid United Healthcare

10   and Molina to the extent CMS paid inflated capitation payments that were based upon ICD-10

11   diagnosis codes obtained from the diabetic retinopathy exams provided to their MA enrolles

12   by MedXM.  Similarly, MedXM violated 42 U.S.C. § 1320a-7b(b)(2)(B) and the FCA by

13   offering and providing Molina's and United Healthcare's MA enrollees the gift cards and the

14   eye exams to induce MA enrollees to participate in their fraudulent scheme.  MedXM further

15   violated the FCA by causing the submission of the invalid RAD from such exams to be

16   submitted to CMS and for making false statements material to the submission of payment data.

17        57.    Because the diabetic retinopathy eye exams provided by MedXM on behalf of

18   United Healthcare and Molina were excluded and/or non-covered Medicare services that were

19   improper for such defendants to provide, any ICD-10 diagnosis codes obtained therefrom are

20   invalid to submit to CMS as RAD for payment purposes, (i.e., risk adjustment data used to

21   increase said defendant Health Plan's capitation payments) and constitute a fraud upon the

22   Government. 42 U.S.C. § 1320a-7a(a)(1)(E); 42 C.F.R. §§ 411.15(a)(1) and (k)(1), 424.5(a),

23   402.3, 422.310(c)-(d); MMCM, Ch. 7 §§ 120.1, 120.1.1; footnotes 6-9

24   **Knowledge**

25        58.    Defendants Wellpoint, Health Net, Aetna and Molina had actual knowledge or

26   should have known that Health Assessments and gift cards offered and provided to their MA

27   enrollees by MedXM constituted illegal remuneration in violation of 42 U.S.C. §1320a-7b(b).

28   Each of the said defendant Health Plans knew that (a) the Health Assessments were not a

covered benefit under original Medicare and therefor deemed not medically reasonable or necessary, (42 C.F.R. § 411.15(a)(1)), (b) the routine physicals were not covered as a supplemental benefit under their MA plan benefits and therefore excluded from Medicare's coverage (42 C.F.R. § 411.15(k)(1)), (c) only specific MA enrollees were selected to receive the Health Assessments, (42 C.F.R. § 1001.952(l)(i)), and (d) the medical necessity for in-home physician services (i.e., Medicare's coverage criteria) was not established or documented for their assessed MA enrollees, (Medicare Claims Processing Manual, Ch. 12 § 30.6.14.1). As a result of the foregoing, each of the said defendant Health Plans knew of the facts that the Health Assessments were in fact non-covered, medically unnecessary and excluded services which could not be legally used as a source of RAD to submit to CMS, (MMCM, Ch. 7 §§ 120.1, 120.1.1, footnotes 6-9).  Further, said defendant Health Plans knew that MedXM, their first tier contractor, was offering and providing gift cards to their MA enrollees, as an inducement to consent to the Health Assessment but only to those MA enrollees that were reluctant to schedule Health Assessments.  42 C.F.R. § 422.504(i).  As a result of having knowledge of the forgoing facts, said defendant Health Plans each knew of the true facts regarding the frauds and violations of the AKS and FCA regarding the Health Assessments provided by MedXM, as set forth in this Complaint.

59.     Similarly, MedXM knew that the Health Assessments and gift cards it offered and provided to the defendant Health Plans' MA enrollees were illegal remuneration in violation of 42 U.S.C. § 1320a-7b(b).  MedXM knew that (a) its contracted providers who performed the Health Assessments of said defendant Health Plans' MA enrollees did not establish or document the medical necessity required for in-home physician visits, (b) the Health Assessments were offered only to select MA enrollees of the defendant Health Plans, and (c) MedXM offered gift cards, as an inducement to obtain consent to the Health Assessments, only to those MA enrollees of the defendant Health Plans that were reluctant to schedule such Health Assessments.  Additionally, MedXM knew that (a) the Health Assessments were not a covered benefit under original Medicare, (b) none of the defendant Health Plans covered routine physicals or the Health Assessment as an approved supplemental

1  benefit, and (c) the defendant Health Plans were improperly submitting RAD obtained from

2  the Health Assessments to CMS to increase their capitation payments. As a result of having

3  knowledge of the forgoing facts, MedXM knew the true facts regarding the frauds and

4  violations of the AKS and FCA regarding the Health Assessments provided by MedXM, and

5  submission to CMS of the resulting RAD, as set forth in this Complaint.

6        60.    Defendants United Healthcare, Molina and MedXM each that the diabetic

7  retinopathy eye exams and gift cards offered and provided to their MA enrollees by MedXM

8  constituted illegal remuneration in violation of 42 U.S.C. § 1320a-7b(b). United Healthcare

9  and Molina are responsible for making sure that their first tier contractors, such as MedXM,

10  comply with their contractual requirements with CMS and all Medicare regulations. 42 C.F.R.

11  § 422.504(i). United Healthcare's and Molina's contracts with MedXM to perform diabetic

12  retinopathy exams were designed to have MedXM solicit, arrange and provide diabetic

13  retinopathy eye exams to United Healthcare's and Molina's MA enrollees without involving

14  the MA enrollees' treating physician. This plan was in blatant violation of Medicare's

15  requirement that such diagnostic tests be ordered by the MA enrollee's treating physician. 42

16  C.F.R. § 410.32(a). As a result, such tests are not medically necessary nor reasonable, and

17  submitting the RAD from such tests to CMS as valid RAD is a fraud. As a result of having

18  knowledge of the foregoing facts, United Healthcare, Molina and MedXM knew that they

19  were violating the AKS and FCA with regards to the diabetic retinopathy eye exams provided

20  by MedXM and submission to CMS of the resulting RAD, as set forth in this Complaint.

21  **Express and Implied False Certifications**

22        61.    At all times relevant, 42 C.F.R. § 422.504(*l*)(2) required the CEO of defendants

23  Wellpoint, Health Net, Aetna, Molina and United Healthcare, or someone acting on the CEO's

24  behalf, periodically and at least annually certify to CMS that all of the RAD that such

25  defendants submitted to CMS, during the course of a calender year, was accurate, truthful and

26

27

28

-24-

1   complete to his/her best knowledge, information and belief.[12]   Compliance with this

2   certification requirement is expressly stated as a condition of receiving the defendant Health

3   Plans' monthly capitation payments.  Relators are informed and believe and thereupon allege

4   that each of the aforementioned defendant health plans submitted their 42 C.F.R. §

5   422.504(*l*)(2) certifications to CMS for each of the years in question.

6       62.    The attestations made by the each of the aforementioned defendant health plans

7   regarding the accuracy, truthfulness and completeness of any and all RAD submitted to CMS

8   that such defendants obtained from MedXM was knowingly false. 42 C.F.R. §§ 422.504(*l*)(2),

9   (i)(4)(iii)-(iv).  Each of the aforementioned health plan defendants knew that such RAD was

10   obtained from excluded, non-covered and medically unnecessary sources and therefore invalid

11   to submit to CMS.  Further, all of the RAD which such defendants obtained from MedXM was

12   the also the result of illegal remuneration in violation of the AKS, as previously described, and

13   therefore a violation of the 31 U.S.C. §3729(a)(1)(A) and (B).

14      63.    The certifications pursuant to 42 C.F.R. § 422.504(*l*)(2), submitted to CMS by

15   each of the defendants Wellpoint, Health Net, Aetna,  Molina, and United Healthcare

16   constitute a false and fraudulent claim for payment in violation of 31 U.S.C. § 3729(a)(1)(A)

17   and (B) because said aforementioned defendants knew that the RAD obtained form MedXM

18   was invalid for the reasons described in the preceding paragraph.  The express certifications

19   were material because they were a condition of CMS paying such defendants their capitation

20   payments and because CMS relied on the veracity of these attestations.  CMS had no way of

21   easily knowing that aforementioned health plan defendants had submitted invalid RAD,

22   obtained from improper in-home assessments.  Had CMS been aware of these facts it would

23   not have made the capitation payments to such defendants. <u>CMS Announcement of Calendar</u>

24   <u>Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D</u>

25

26      [12]See  2012 Regional Technical Assistance Encounter Data Participant Guide, §2.5.4
27   which states, "MAOs and other entities are responsible for the accuracy of all encounter data
     submitted and must ensure that every submission can be supported by an original source document
28   (i.e. a medical record).  MAOs and other entities must also attest that the data submitted is based on
     best knowledge, information, and belief and be accurate and truthful."

1  Payment Policies and Final Call Letter, (April 16, 2015) p. 145. By submitting the RAD to
2  CMS that defendants Wellpoint, Health Net, Aetna, Molina and United Healthcare obtained
3  from MedXM, such defendants were also impliedly certifying that such RAD was accurate
4  complete and truthful in accordance with 42 C.F.R. § 422.504(*l*)(2). The knowing submission
5  of invalid RAD and RAD that was obtained in violation of the AKS bars defendants
6  Wellpoint, Health Net Aetna, Molina and United Healthcare from making a valid attestation
7  pursuant to 42 C.F.R. § 422.504(*l*)(2). 79 Fed.Reg. No. 100, 29844, 29923 (May 23, 2014).

8      64.    42 C.F.R. § 422.504(*l*)(3) requires MedXM to periodically certify the accuracy,
9  completeness, and truthfulness of the RAD submitted to its MAO clients, including the
10  defendant Health Plans. Relators are informed and believe and thereupon allege that MedXM
11  made at least one such express certification to each of the health plan defendants. Such
12  express certifications were false because MedXM knew that such RAD was obtained from
13  medically unnecessary and excluded sources as previously described. In addition, MedXM
14  knew that it had offered and provided illegal remuneration via free, non-covered services as
15  well as gift cards as inducements to MA enrollees thereby violating the AKS and the FCA.
16  By submitting the invalid RAD to these defendants, knowing that it would be submitted to
17  CMS, MedXM impliedly certified that its submitted RAD was accurate complete and truthful
18  under 42 C.F.R. § 422.504(*l*)(3).

19      65.    MedXM's express and/or implied certifications were false. MedXM engaged
20  in noncompliant and fraudulent practices including, but not limited to, (a) knowingly
21  performing non-covered and excluded Health Assessments, (b) performing excluded and non-
22  covered diabetic retinopathy exams, (c) violating the AKS by offering free non-covered and
23  excluded services to induce MA enrollees to utilize MedXM's services, (c) violating the AKS
24  by offering gift cards to induce MA enrollees to utilize MedXM's services, and (d) improperly
25  causing to be submitted to CMS diagnosis codes obtained from such examinations and
26  misconduct. MedXM's noncompliant and/or fraudulent conduct prevented MedXM from
27  making valid attestations pursuant to 42 C.F.R. § 422.504(*l*)(3).

28      66.    The certifications pursuant to 42 C.F.R § 422.504(*l*)(2) provided by defendants

-26-

Wellpoint, Health Net Aetna, Molina and United Healthcare are material under the FCA because such attestations are a key component of the MA program's integrity. *See,* 63 Fed.Reg. 34968, 35017 (June 28, 1998), and footnote 2 hereinabove. During and between 2007 through payment year 2014, 100% of the data submitted by MAOs that was used in calculating enrollee's risk scores was in an abbreviated format comprised mostly of ICD-10 diagnosis codes. 42 C.F.R. § 422.310(d). This data was submitted to CMS via the risk adjustment processing system (RAPS) computer portal. *See,* CMS, 2007 Risk Adjustment Data Training For Medicare Advantage Organizations, Participant Guide, p. 10.[13] The RAPS system is susceptible to fraud because the abbreviated data set cannot be easily verified without performing detailed on-site medical chart data validation audits. In addition, the RAPS submission does not provide enough information to help calibrate the HCC risk model nor improve its accuracy. *See,* 2012 Regional Technical Assistance Encounter Data Participant Guide, §§ 2-1, 2-3, 3, 3.1 available at: https://csscoperations.com/internet/cssc3.nsf/DocsCat/ CSSC~CSSC%20Operations~Medicare%20Encounter%20Data~Training%20Information ~8XTMCV2008?open&navmenu=Medicare^Encounter^Data||||. As a result, CMS is phasing out the abbreviated RAPS risk adjustment data submission and replacing it with a detailed encounter data submission (EDS) that is very similar to what is currently used in traditional FFS Medicare. Announcement of Calendar Year (CY) 2017 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter, (April 4, 2016) pp. 60-61, available at: https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtg SpecRateStats /Downloads/Announcement2017.pdf. The change from RAPS to EDS will be completely phased in for risk adjustment in the MA program by 2020. *Id.* p. 60. During the transition phase (2016-2020) and at all times prior, the MA Program's integrity is based predominately on truthful § 422.504(*l*)(2) data certifications from the MAOs' Senior Corporate Officers, and the MAOs implementation of an effective compliance program designed to identify and correct Medicare fraud, waste and abuse as a basis for such attestations. 42

---

[13]Available at:
https://www.csscoperations.com/internet/Cssc.nsf/files/ra-resourceguide_120607.pdf/$FIle /ra-resourceguide_120607.pdf

-27-

C.F.R. § 422.503(b)(4)(iv); 79 Fed. Reg. 29844, 29923 (May 23, 2014). Had CMS known that the defendant Health Plans' certifications were false, CMS would have taken drastic measures, including, but not limited to, suspending the defendant Health Plans' capitation payments.

**Whistle Blower Retaliation**

67.     Realtor Kaitlyn Truman (Truman) was employed with MedXM between May 2015 to June 23, 2016, as a data processing (DP) department assistant supervisor. While working at MedXM Truman was also finishing her Bachelors Degree in Health Care Administration from California State University, Long Beach (degree awarded May 2016). Truman's talents and leadership skills were quickly recognized by her supervisors. After just three months Truman was given a $3.00 per hour raised from $14 per hour to $17 per hour.

68.     The main function of the DP department was to notify and transmit copies of completed Health Assessments and diabetic retinopathy eye (DRE) exam reports and bone density exams, also known as DEXA Scans,[14] to the MA enrollee's PCP or the PCP's staff. Truman assisted supervising a staff of twenty-five data processors, sixteen of whom worked on transmitting Health Assessments and DEXA Scans to PCP offices, and nine of whom worked on transmitting DREs to PCP offices. Each DP staff member was expected to make between 80-100 outbound contacts per day. DP staff that continuously fell below this mark were counseled, retrained and/or terminated.

69.     Truman assisted in organizing the distribution of work flow, training new DP staff members and retraining DP staff that were struggling. In addition, Truman designed work flow tracking tools to help manage the backlog of reports awaiting transmission to PCPs. Many of the Health Assessments were six months old by the time the DP department was given them for transmission to PCP offices.

---

[14] All of the defendant Health Plans, except Aetna, contracted with MedXM to provide in-home DEXA Scans to female MA enrollees who were documented to be at risk for osteoporosis. The data obtained was submitted to CMS for use in a Five Star Rating program that spans approximately 35 different factors. ICD-10 diagnosis codes were not obtained by MedXM. Additionally, the DEXA Scans performed by MedXM were illegally conducted by unlicensed and unsupervised technicians and such DEXA Scans failed to comply with CMS coverage requirements that such test be ordered by the enrollees treating, physician, were supervised by a physician and include the interpretation. 42 C.F.R. §§410.31(a), (b), 422.32(a)-(c).

70.     During her first two weeks on the job, Truman received numerous complaints from enrollees' PCPs that had previously received services from MedXM. The PCPs informed Truman that the Health Assessments reports that MedXM provided were fabrications because their enrollees' claimed that they never received an in-home Health Assessment examination. PCPs also complained that the medical diagnosis in the Health Assessments were exaggerated or falsified because such enrollees did not have the medical conditions reported by MedXM's medical examiners. Truman learned that similar complaints were heard throughout the DP department on a regular basis.

71.     Truman discussed these complaints with her supervisor, Rosa Lemus (Lemus), and asked Lemus to investigate the allegations made by the PCPs. Lemus refused to investigate the complaints, explaining to Truman that such complaints are normal and are due to the MA enrollees' poor memories.

72.     In October of 2015, Truman began attending regular meetings regarding MedXM's contract to perform diabetic retinopathy eye exams on behalf of defendants United Healthcare and Molina. Truman was informed her supervisor, Lemus, that the DP staff was going to code the diabetic retinopathy reports that had been uploaded into MedXM's electronic medical health record computer system and insert ICD-10 diagnosis codes and CPT (Common Procedure Terminology) codes into the reports. Truman protested this activity because neither she nor anyone else in the DP department had any coding experience. MedXM refused Truman's request to provide the DP staff training on correct coding principals. Instead of training, Truman was handed a list of ICD-10 diagnosis codes that indicated some type of positive result from the diabetic retinopathy eye exam and was instructed to pick the code that seemed to be the closest match to the optometrist's notes in the medical record and to train the DP staff accordingly.

73.     In attempting to train other DP staff on coding, the diabetic retinopathy eye exams, it became obvious that many staff members were using ICD-10 codes that were incorrect. Truman routinely brought up the illegality of the DP staff performing the coding functions and the liability for routinely coding the tests incorrectly to her supervisor, Lemus.

-29-

74. By November 2015, Truman was informed that she was being given a "promotion" and was to put in charge of special projects. Truman was not given a new job description outlining her responsibilities nor a new title or pay raise.

75. Truman quickly realized that the change in job assignments was a form of punishment for insisting that Lemus initiate an internal investigation into MedXM's fraudulent practices. Truman's work area was moved to an empty area of the office were there were no MedXM staff near by, she was no longer responsible for assisting in supervising any DP staff, distributing DP work flow, tracking DP backlogs, contacting PCP offices nor helping with the DP department work load in any material way. Further, Truman was no longer invited to various meetings that she had previously attended on a regular basis with Lemus. Prior to her change in status, (i.e., the so called "promotion"), Truman was told by Lemus that she was going to be trained on a number of MedXM's processes so she could advance in the organization but this never materialized and was not discussed with her again.

76. After two months of no work assignments, Truman met with MedXM's HR Director, Diane Bailey, to get advice on resolving the retaliation against Truman. Bailey informed Truman that she had to take the issue up with Lemus, her immediate supervisor. Afterwards, Lemus verbally reprimanded Truman for going to HR but then assigned Truman DRE exams to code and requested that Truman produce and implement a DRE tracking report. Truman was able to complete these work assignments in less than one hour the first day and in approximately twenty minutes a day thereafter.

77. During January 2016 until March 2016, Truman was made temporary DP supervisor. As temporary DP supervisor, Truman renewed her complaints to Lemus concerning the illegality of the DP staff coding the DRE exams and the potential frauds caused by their coding inaccuracies. After failing to obtain a satisfactory response from Lemus, Truman met with MedXM's coding department's manager, Susan Peterson (Peterson). Truman was hoping that Peterson would clarify whether or not there are restrictions that would prohibit the DP department from coding the DREs. Additionally, Truman wanted Peterson to provide training and oversight of the DP department's coding to improve coding accuracy.

-30-

1 | Peterson refused to address the issues and declined Truman's request to provide any training,
2 | oversight, review or auditing of the DP staff's coding of DRE exams.

3 |       78.    During March 2016, Truman was asked by Lemus to train Nicola Foehy (Foehy)
4 | to take over Truman's previous position as DP supervisor). After the training was completed,
5 | Mohsen Zahedi, MedXM's CFO ("CFO Zahedi") noticed that Foehy took frequent and
6 | extended cigarette breaks. Out of frustration, he turned to Truman asking, "Did you train her
7 | to take so many smoking breaks?" Truman explained that she did not train Foehy to take
8 | excessive breaks but felt it was no longer her place to reprimand Foehy because Lemus, not
9 | Truman, was Foehy's supervisor. CFO Zahedi instructed Truman to immediately inform
10 | Lemus about the issue which she timely did.

11 |       79.    The next day, Truman was ordered to see Peggy Zahedi, MedXM's VP
12 | Operations and CFO Zahedi's wife. Mrs. Zahedi reprimanded Truman for speaking to Lemus
13 | regarding Foehy's smoking which Mrs. Zahedi mischaracterized as gossiping about Foehy to
14 | other employees. Truman explained that she was instructed to address the issue by CFO
15 | Zahedi. Mrs. Zahedi then lost her temper and began yelling at Truman, ordering her to "never
16 | speak to Mohsen again, you have no reason to speak to Mohsen."

17 |       80.    On June 17, 2016, Truman's immediate supervisor, Lemus, conducted Truman's
18 | annual employee review. Lemus informed Truman that she was doing an excellent job and
19 | provided no criticism or admonishments of any kind. At the end of the review, Lemus
20 | informed Truman that she was receiving a pay raise of $1.00 per hour back dated to May 17,
21 | 2016, the one year anniversary of her start date.

22 |       81.    On June 23, 2016, MedXM's Director of Human Resources and Compliance
23 | Officer, Diane Bailey, met with Truman and terminated her employment. Bailey informed
24 | Truman that the reason she was being terminated was because during the past couple of days
25 | she spent an excessive amount of company time using Chatbox. Chatbox is a text and
26 | messaging application that MedXM had activated to allow employees to socialize and engage
27 | in personal communications with co-workers without going through MedXM's company e-
28 | mail server. Truman was surprised by the termination and Bailey's comments. Truman had

not received any negative comments or reviews regarding any of her work assignments, had been given an excellent review and pay raise just one week earlier and had never been informed that there were concerns or restrictions regarding the quantity of Chatbox communications allowed nor any issues regarding Truman's Chatbox use.

82.     Truman had never given her consent MedXM to monitor or access her Chatbox account. MedXM failed to publish a written policy set forth in the employee handbook or otherwise to obtain Truman's consent for accessing her personal Chatbox communications or other electronic communications at work. As a result, MedXM violated Truman's inalienable right to privacy guaranteed under the California Constitution, Article I, Section 1 by accessing her personal Chatbox communications without authorization and consent. Truman had a reasonable expectation to privacy, despite the fact the communication took place at the workplace, because Chatbox was set up for non-company personal communications and Truman had not given MedXM her authorization or consent to monitor or access such communications. *See*, TBG Ins. Servs. Corp., v. Superior Court, 96 Cal. App. 4th 443, 552, 117 Cal. Rptr. 2d 155, 163 (2002), ["TBG's advance notice to Zieminski (the company's policy statement) gave Zieminski the opportunity to consent to or reject the very thing that he now complains about, and that notice, combined with his written consent to the policy, defeats his claim that he had a reasonable expectation of privacy."]

83.     Likewise, MedXM's intentional, un-authorized and un-consented access of Truman's Chatbox communications violated the Federal Stored Communications Act ("FSCA") which provides a cause of action against any person or entity which "intentionally accesses without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage." 18 U.S.C. § 2701(a).

84.     Truman believes that the content of her last Chatbox message was one of the reasons she had been terminated. Truman's last Chatbox message was to a co-worker regarding MedXM illegally performing DEXA Scans with unlicensed staff. Truman was

-32-

1    terminated and her Chatbox account deactivated before she could receive a response.

2          85.     During and between September 2015 and June 2016, Truman had numerous

3    conversations with her immediate supervisor, Lemus, and MedXM Supervisors/Managers,

4    including Robert Zahedi, Susanna Peterson, and Diane Bailey complaining that:

5                    i.      The DEXA Scans were being performed by MedXM employees that are

6                           not validly licensed making the DEXA Scans false and fraudulent;

7                   ii.     MedXM improperly used DP staff to code the DRE reports resulting in

8                           inaccurate and fraudulent diagnosis codes being sent to CMS;

9                  iii.    MedXM refuses to properly train the DP staff to code correctly and

10                          refuses to audit and oversee the coding to make sure such coding was

11                          correct;

12                 iv.    The Health Assessments and other reports that DP transmits are not done

13                          timely and are regularly rejected by the enrollees' PCPs due to their

14                          lateness;

15                  v.     MA enrollees and/or PCPs that receive MedXM's Health Assessments

16                          routinely claim that such reports are fabrications in that the examinations

17                          had never been performed; and

18                 vi.    PCPs routinely complain that the Health Assessments' medical diagnoses

19                          are incorrect and fraudulent because the enrollees never had the medical

20                          conditions that are documented by MedXM's medical examiners.

21        86.     As a result of Truman complaining of such misconduct, MedXM retaliated

22   against Truman in violation of 31 U.S.C. § 3730(h)(1) by discriminating against Relator in the

23   terms and conditions of her employment and/or subjecting her to a hostile work environment

24   that included, but was not limited to:

25                   i.      Refusing to investigate, correct or take appropriate action to correct the

26                          fraudulent misconduct Truman complained of;

27                  ii.     Taking away her responsibilities to supervise DP staff;

28                 iii.    Taking away all job duties for a period of two months;

-33-

iv.   Physically relocating Truman to an isolated part of the bullpen work area where she could not have contact with other MedXM staff;

v.    Not allowing her to participate in meetings that she had previously regularly attended;

vi.   On or about March 16, 2016 being yelled at and berated by the Vice President of Operations and ordered not to speak with MedXM's CFO (the V.P's husband);

vii.  Having her Chatbox comminations read without her knowledge or consent;

viii. Hiring Truman's replacement as assistant DP supervisor and requiring Truman to train her before terminating Truman; and

ix.   Terminating Relator's employment during June 2016.

87.    As a result of such retaliation and discrimination, Truman has suffered, and will continue to suffer, emotional distress, worry, anxiety and humiliation in an amount according to proof at trial in excess of $75,000 and lost earnings in the amount according to proof at trial.

88.    In retaliating against Truman, MedXM acted with fraud, oppression and malice, warranting an award of punitive damages against MedXM in an amount to be determined at trial.

89.    Villamil worked in MedXM's DP department from October 2015 to the end of May 2016.  His main job responsibility was to contact PCP offices to inform them that MedXM had performed DEXA Scans on MA enrollees assigned to them and to arrange for copies of the DEXA Scan reports to be sent to the PCP offices.  As a result of his interactions with PCPs and their office staff and enrollees, Villamil became aware of the following fraudulent acts by MedXM:

i.    The DEXA Scans that MedXM performed had no clinical value because the results of the DEXA Scans did not include the required physician interpretation and as a result were frequently rejected by the PCPs;

ii.   The DEXA Scans MedXM performed had no clinical value because the

-34-

DEXA Scan results were not timely provided to the PCPs until six months or longer after the exam was performed and as a result were frequently rejected by the PCPs;

iii.    Some of the Health Assessments MedXM claimed to have performed were fabricated because enrollees regularly complained that no such examinations had been performed; and

iv.    The Health Assessments MedXM performed contained false or fraudulent medical diagnoses because the PCPs claimed that the enrollees never had the medical conditions documented by MedXM's medical examiner. As a result these PCPs frequently rejected the Health Assessment reports, and many also requested that MedXM refrain from sending them any such reports in future.

90.    Villamil also learned that his co-workers in the DP department received similar complaints from PCPs, PCP office staff and enrollees on a regular basis.

91.    During and between March 13, 2017 and May 19, 2017, Villamil met with his supervisor, Foehy, at least three times to inform her that he believed MedXM was engaged in widespread Medicare fraud as a result of MedXM performing invalid DEXA Scans, fabricating Health Assessments and upcoding medical diagnoses on Health Assessments as described in paragraph 89. During each of these meetings, Villamil requested that MedXM conduct an investigation in order to discontinue performing the fraudulent acts and made it clear that he did not want participate in any fraudulent actives on behalf of MedXM. Despite Villamil's frequent requests to Foehy, MedXM did not initiate any investigation into any of the Medicare frauds that Villamil had raised. The last of these meetings was approximately one to two weeks prior to Villamil's termination.

92.    At the end of the day on Friday May 27, 2016, Bailey informed Villamil that he was being terminated in accordance with MedXM's progressive discipline policy because of his ongoing inability to keep up with his work load. Villamil protested stating that he had never been behind in his work, as of Thursday had completed all the work assigned to him and spent the day assisting other

-35-

1  staff members in completing their assigned confirmations per the DP department's protocols, and

2  Villamil had never been counseled by his supervisor that there was any issue regarding his

3  productivity.

4      93.    Bailey then informed Villamil that an additional reason for his termination was because

5  he had recently spent two hours on Chatbox on company time.  Bailey informed Villamil that she read

6  the content of Villamil's Chatbox messages and can review the content of any MedXM employee's

7  Chatbox messages.  Villamil refuted the accusation that he spent two hours using Chatbox when he

8  was supposed to be working and demanded to see the data that supported Bailey's claim.  Bailey

9  refused but admitted that she had not personally verified the accusation that Villamil spent two hours

10  on Chatbox.  Bailey's admission can be interpreted two ways, (a) Bailey is lying and knows the

11  accusation is false and/or (b) Bailey has given her subordinates access to read MedXM employee's

12  confidential chatbox communications.

13      94.    Villamil had never given MedXM his consent to monitor or access his Chatbox

14  account. MedXM failed to adopt and publish a written policy set forth in the employee

15  handbook or otherwise to obtain Villamil's consent for accessing his personal Chatbox

16  communications or any other electronic communications.  As a result, MedXM violated

17  Villamil's inalienable right to privacy guaranteed under the California Constitution, Article

18  I, Section 1, by accessing his personal Chatbox communications without authorization and

19  consent.  Villamil had a reasonable expectation to privacy, despite the fact the communication

20  took place at the workplace, because Chatbox was set up by MedXM for non-company

21  personal communications and Villamil had not given MedXM his consent or authorization to

22  monitor or access such communications. *See*, TBG Ins. Servs. Corp., v. Superior Court, 96

23  Cal. App. 4th 443, 552, 117 Cal. Rptr. 2d 155, 163 (2002), ["TBG's advance notice to

24  Zieminski (the company's policy statement) gave Zieminski the opportunity to consent to or

25  reject the very thing that he now complains about, and that notice, combined with his written

26  consent to the policy, defeats his claim that he had a reasonable expectation of privacy."]

27      95.    Likewise, MedXM's intentional, un-authorized and un-consented access of

28  Villamil's Chatbox communications violated the FSCA which provides a cause of action

-36-

against any person or entity which "intentionally accesses without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage." 18 U.S.C. § 2701(a).

96.     Villamil believes that the content of his Chatbox messages is one of the reasons for his sudden termination. A few days prior to his termination, Villamil used Chatbox to encourage a female co-worker, Loraine Bova ("Bova"), to insist on having MedXM accommodate her taller height by providing a higher computer monitor stand, explaining that MedXM is required to comply with Bova's request.  Bova had made three prior requests for a higher computer stand because the lower monitor stand caused her pain and discomfort due to her height, but all prior requests had been denied. Bova was terminated on Thursday, May 26, 2016, the day before Villamil was terminated.

97.     As a result of Villamil complaining of such misconduct, MedXM retaliated against Villamil in violation of 31 U.S.C. § 3730(h)(1) and also in violation of *California Government Code* § 12940(h), (m).   Villamil's complaints regarding MedXM's ongoing fraudulent and non-complaint Medicare practices qualifies as a protected activity under FCA. Villamil's monitored Chatbox communication put MedXM on notice that Villamil is opposing MedXM's improper denial of Bova's reasonable accommodation request (i.e., a higher computer monitor stand), as required by *California Government Code* § 12940(m) in order to address Bova's actual or perceived physical disability. *California Government Code* §§ 12926(m), 12926.1(d); California Code of Regulations, Title 2, § 11064.  In opposing MedXM's improper acts, Villamil was engaged in a protected activity.  MedXM had no justifiable cause for Villamil's termination.

98.     As a result of such retaliation and discrimination, Villamil has lost earnings and has suffered, and will continue to suffer, emotional distress, worry, anxiety and humiliation in an amount according to proof at trial.

99.     In retaliating against Villamil, MedXM acted with fraud, oppression and malice, warranting an award of punitive damages against MedXM in an amount to be determined at

1    trial.

2        100.    Villamil is also entitled to recover his attorneys fees, costs and expenses pursuant

3   to 31 U.S.C. § 3730(h)(2).

4 FIRST CLAIM FOR RELIEF

5 (Violation of 31 U.S.C. § 3729(a) against all defendants)

6        101.    Relators reallege and incorporate reference all prior paragraphs of this complaint

7   as though fully set forth at length.

8        102.    At all times mentioned, defendants routinely and repeatedly violated 31 U.S.C.

9   § 3729(a)(1) by:

10            i.     Knowingly presenting and/or causing to present to agents, contractors or

11                 employees of the Government false and fraudulent claims for payment

12                 and approval;

13            ii.    Knowingly making, using, and/or causing to make or use false records

14                 and statements to get false and excessive claims paid or approved by

15                 Medicare;

16            iii.    Conspiring among themselves to violate 31 U.S.C. §3729(a)(1)(A)

17                 and/or (B); and

18            iv.    Knowingly making, using or causing to be made or used, a false record

19                 or statement material to an obligation to pay or transmit money or

20                 property to the Government, or knowingly concealing or knowingly and

21                 improperly avoiding or decreasing an obligation to pay or transmit

22                 money to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

23        103.    Relators are informed and believe, and upon such information and belief allege,

24   that as a result of defendants' fraudulent misconduct, the Government was damaged in excess

25   of $250,000,000.

26        104.    As a result of defendants' conduct, defendants are liable to the Government for

27   three times the amount of damages sustained by the Government as a result of the false and

28   fraudulent misconduct alleged above.

-38-

105.   As a result of defendants' conduct, 31 U.S.C. § 3729(a) provides that defendants are liable to the Government for civil penalties between $5,000 and $10,000 for each such false and fraudulent claim for payment.

106.   Relators are also entitled to recover their attorneys fees, costs and expenses from defendants pursuant to 31 U.S.C. § 3730(d).

SECOND CLAIM FOR RELIEF

(Violation of 31 U.S.C. § 3730(h) against MedXM)

107.   Relators reallege and incorporate by reference all previous paragraphs of this complaint as though fully set forth at length.

108.   As a result of such retaliation and discrimination, Relators for have suffered, and will continue to suffer, emotional distress, worry, anxiety and humiliation and are entitled to compensation for these damages in an amount according to proof at trial.

109.   Additionally Relators are entitled to compensation equal two times the amount of lost wages, plus interest, and reinstatement with the same seniority status they would have had but for the discrimination.

110.   In retaliating against Relators, MedXM acted with fraud, oppression and malice, warranting an award of punitive damages against MedXM in an amount to be determined at trial.

111.   Relators are also entitled to recover from MedXM their attorneys fees, costs and expenses pursuant to 31 U.S.C. § 3730(h)(2).

THIRD CLAIM FOR RELIEF

(Violation of 18 U.S.C. §2701 against MedXM)

112.   Relators reallege and incorporate by reference all previous paragraphs of this complaint as though fully set forth at length.

113.   MedXM violated Realtors' privacy in violation of 18 U.S.C. § 2701 by MedXM's intentional and unauthorized access to the Relators Chatbox communications. As a result, the Relators suffered damages in an amount according to proof at trial but in no event less than the statutory minimum damages.  18 U.S.C. § 2707(c).

-39-

114.    In violating Relators' privacy, MedXM acted with fraud, oppression and malice, warranting an award of punitive damages against MedXM in an amount to be determined at trial.  18 U.S.C. § 2707(c).

115.    Relators are also entitled to recover from MedXM their attorneys fees, costs and expenses pursuant to 18 U.S.C. § 2707.

## FOURTH CLAIM FOR RELIEF

(Violation of California Constitution Article I, Section 1 against MedXM)

116.    Relators reallege and incorporate by reference all previous paragraphs of this complaint as though fully set forth at length.

117.    MedXM violated Realtors' privacy in violation of California Constitution, Article I, Section 1 by MedXM's intentional and unauthorized access to the Relators' electronic communications. Relators suffered damages in an amount according to proof at trial.

118.    In violating Relators' privacy, MedXM acted with fraud, oppression and malice, warranting an award of punitive damages against MedXM in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

(Violation of *California Government Code* § 12940 by Villamil against MedXM)

119.    Realtor Villamil brings this claim for relief in his individual capacity.

120.    Villamil realleges and incorporates by reference all previous paragraphs of this complaint as though fully set forth at length.

121.    As a result of such retaliation and discrimination, Villamil has suffered, and will continue to suffer, emotional distress, worry, anxiety and humiliation in an amount according to proof at trial.

122.    As a result of such retaliation and discrimination, Villamil has suffered, and will continue to suffer, lost earnings in an amount according to proof at trial.

123.    In retaliating against Villamil, MedXM acted with fraud, oppression and malice, warranting an award of punitive damages against MedXM in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Qui Tam Relator prays for relief as follows:

### FOR THE FIRST CLAIM FOR RELIEF

1. Treble the Government's damages according to proof;

2. Civil penalties according to proof;

3. A Relator's award of up to 30% of the amounts recovered by or on behalf of the Government;

### FOR THE SECOND CLAIM FOR RELIEF

4. General damages in amount according to proof;

5. Reinstatement with the same seniority status that Relators would have had but for the discrimination and retaliation;

6. Two times the amount of back pay;

7. Interest on the back pay;

8. Punitive damages according to proof;

### FOR THE THIRD CLAIM FOR RELIEF

9. Compensatory damages in amount according to proof;

10. Punitive damages according to proof;

### FOR THE FOURTH CLAIM FOR RELIEF

11. Compensatory damages in amount according to proof;

12. Punitive damages according to proof;

### FOR THE FIFTH CLAIM FOR RELIEF

13. Compensatory damages in amount according to proof;

14. Punitive damages according to proof;

### FOR ALL CLAIMS FOR RELIEF

15. Attorneys fees, expenses, and costs; and

16. Such other and further relief as the Court deems just and proper.

///

///

1

THE HANAGAMI LAW FIRM
A Professional Corporation

2

3

THE ZINBERG LAW FIRM
A Professional Corporation

4

5   Dated: May 2{, 2018          By: _____

6                                     Abram J. Zinberg
                                      Attorneys for Plaintiffs and Qui Tam Relators,
                                      Paul Villamil and Kaitlyn Truman

7

8                    REQUEST FOR JURY TRIAL

Plaintiffs and Qui Tam Relators hereby requests a trial by jury.

9

10                               THE HANAGAMI LAW FIRM
                                 A Professional Corporation

11                               THE ZINBERG LAW FIRM
                                 A Professional Corporation

12

13   Dated: May 2{, 2018          By: _____

14                                     Abram J. Zinberg
                                       Attorneys for Plaintiffs and Qui Tam Relators,
                                       Paul Villamil and Kaitlyn Truman

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-42-

COMPLAINT